Engberry, Appellant, vs. Rousseau, Respondent.

*February 6—February 24, 1903.*

*Specific performance: Land contract: Discretion.*

In an action to compel specific performance of a contract for the sale of land, it appearing, among other things, that there had been "sharp practice" on the part of plaintiff, a real-estate broker, in obtaining the contract from defendant without disclosing the fact that he had already contracted to sell the property at a considerable advance, while defendant supposed

plaintiff was acting simply for his (defendant's) interest, and that plaintiff without defendant's knowledge and without right had taken possession of the property and collected rents, it is *held* that the trial court rightly exercised its discretion in refusing to decree performance.

APPEAL from a judgment of the circuit court for Portage county: CHAS. M. WEBB, Circuit Judge. *Affirmed.*

The cause was submitted for the appellant on the brief of *Owen & Frost,* attorneys, and *John H. Brennan,* of counsel.

For the respondent there was a brief by *Cate, Lamoreux & Park,* and oral argument by *F. J. Carpenter.*

WINSLOW, J. This is an action brought by the vendee in a contract for the sale of land to compel specific performance. The contract was not a formal written land contract, but was made by correspondence between the parties. The trial court found that this correspondence constituted a valid contract, but refused to enforce the same, on the ground that the conduct of the plaintiff was such that a court of equity, in the exercise of its discretion, ought not to enforce it. The facts were not materially in dispute, and were, in brief, as follows:

In October, 1900, the defendant, *Rousseau,* resided in Chelsea, Taylor county, Wisconsin, and the plaintiff lived at the city of Stevens Point and was a member of a firm of real-estate dealers known as Buckingham & Engberry. The defendant was one of the six heirs at law of one M. A. Rousseau, deceased, and, with his co-heirs, owned lot 147 in a certain addition to the city of Stevens Point. He was also one of the five heirs of Mrs. Sophia K. Rousseau, deceased, which last-named heirs owned lot 148, an adjoining lot in the same addition. On October 16, 1900, the defendant wrote to the firm of Buckingham & Engberry, calling attention to the two lots, and stating that he and his co-owners desired to sell them, and asking what they were worth and what the chances for sale were. To this letter the plaintiff replied individually by telegraph, not answering the questions asked but asking what

net cash offer would be accepted and whether defendant
wished to place the property in his hands.  The defendant
replied to this telegram by letter dated October 19th, in
which he stated that the price of the whole property was
$1,500; that he would be glad to place it in defendant's hands
on a favorable basis; asked what plaintiff's commission or
percentage would be, and stated that he would furnish war-
ranty deed as soon as the money or its equivalent was de-
posited in bank.  The plaintiff made no direct reply to this
letter, but without the defendant's knowledge immediately en-
tered into negotiations with one Davidson for the sale of the
property, which resulted in a bargain to sell the property to
Davidson for $1,500, and on the 1st day of November tele-
graphed the plaintiff that he had a deal on hand (not describ-
ing it) in which he could give defendant $1,300 cash for the
property on receipt of a clear warranty deed, but that, in
order to carry it, he should have to take other property in ex-
change and furnish the money, and that he expected to close
something quick.  To this defendant replied by letter on the
same day to the effect that the offer was accepted and the deed
would be ready in a few days; that there were five heirs, and
he must get powers of attorney; and that he would be ready
the first of the coming week.  On November 7th he forwarded
a warranty deed of the property to the Citizens' National
Bank at Stevens Point, with instructions to deliver the same
to plaintiff on payment of $1,300, and so informed the plaint-
iff by letter, in which he also stated that plaintiff would find
quitclaim and powers of attorney on record.

On November 10th plaintiff replied by letter, acknowledg-
ing the forwarding of the deed, and stating that there would
be no unnecessary delay in remitting proceeds as soon as the
title could be verified; that he had secured an abstract, and,
though it did not show the property to correspond with the
deed, he believed that the quitclaims and powers of attorney
would bring out the title perfectly; that the abstract showed

a mortgage to one Burr for $125, but he assumed that it had been paid, but not discharged; and that he expected to be able to write fully Monday or Tuesday regarding the matter, if everything did not come out right. The defendant replied to this letter at once, stating that the Burr mortgage had been paid, and requesting that the money be paid without. delay. No immediate reply was made to this letter by the plaintiff, nor was the money deposited, for the reason, as plaintiff claims, that the title was still defective, not only because of the undischarged mortgage to Burr, but also because it was found by the plaintiff that one Orville Rousseau, a brother of the defendant, and one of the five co-owners of lot 148, had not given defendant a power of attorney to convey his interest in said lot; and that one Mary Reidlan (daughter of M. A. Rousseau, but not of Sophia K.) possessed either an undivided sixth of lot 147, as heir at law, or else owned a charge of $50 upon said lot, under an unprobated will of M. A. Rousseau.

Thereupon the plaintiff proceeded to take upon himself to procure by probate proceedings and otherwise the straightening out of these difficulties in title, and further correspondence ensued. Plaintiff did not, however, maintain the *status quo* while endeavoring to perfect the title. While he refrained from depositing the $1,300 in the bank (and never had done so up to the time of the commencement of the action), he went to the defendant's tenant in possession of the premises early in November, and demanded that future rent be paid to him (plaintiff), and such rent was thereafter paid by the tenant to the plaintiff for the months of November and December, and this was done without the knowledge or consent of the defendant. He proceeded, also, with the Davidson deal, and on the 23d day of November executed a deed of the property to Davidson, which he caused to be recorded December 17, 1900, and received from Davidson at or about the time of the execution of the deed $350 in cash, none of

which facts were known to the defendant until January 21st in the following year. On December 11th the plaintiff deposited $300 in the bank at Stevens Point to his own credit, the bank refusing to receive it upon the deed.

Several letters passed between the parties after November 10th, on the part of the plaintiff asking for information with regard to the defects in title, and on the part of the defendant furnishing such information and insisting on the closing of the transaction, until December 20th, when the defendant wrote the plaintiff, notifying him that the deal must be closed at once. To this the plaintiff replied December 24th, stating that the county judge would not issue a certificate of heirship as to the property of M. A. Rousseau, because he was informed there were six heirs, instead of five, and that he (plaintiff) was informed that there was an unprobated will in existence which would straighten the matter out, and requesting the defendant to produce the will. In this letter the plaintiff for the first time informs the defendant that he has sold and deeded the property to another, and that he proposes to carry out the bargain with defendant. To this letter defendant did not reply, but came to Stevens Point January 21, 1901, and, finding that the money had not been paid into the bank, and also learning of the taking possession of the property and the collection of rents by the plaintiff and the transaction with Davidson, withdrew the deed from the bank, and refused to go any further with the negotiation.

The trial court found as a fact, in addition to the facts above stated, that the plaintiff did not in good faith attempt nor intend to perform his contract with the defendant, but intended and attempted to obtain and secure to himself the beneficial control and possession of the premises, and to delay the performance of the contract an unreasonable time, if he should perform it at any time; and concluded as matter of law that the plaintiff was not entitled to a decree of specific performance.

The general rules which govern courts of equity in actions for specific performance of land contracts are well understood. Whether specific performance will be decreed or not is a question addressed to the sound discretion of the court. It is not a matter of strict right. As said by Chief Justice RYAN in *Williams v. Williams,* 50 Wis. 311, 6 N. W. 814:

"A court of equity must be satisfied that the claim for a deed is fair, just, and reasonable, and the contract equal in all its parts, and founded on an adequate consideration, before it will interpose with this extraordinary assistance. If there be any well-founded objection on any of these grounds, the practice of the court is to leave the party to his remedy at law for compensation in damages."

Acting in the light of these principles the trial court evidently determined that the plaintiff's claim was not "fair, just, and reasonable"; and there were certainly circumstances in evidence which go far to justify that conclusion. While there probably was not actual fraud on the part of the plaintiff, there was what might well be called "sharp practice," not pleasant to contemplate, and not calculated to appeal with favor to the conscience of the Chancellor. The immediate taking possession of the property and collecting of the rents without the knowledge of the defendant, and without shadow of right, and the sale of the property at a considerable advance, without disclosing the nature of the transaction and while the defendant was evidently justified in supposing that the plaintiff was acting simply for his (defendant's) interest, are circumstances from which the conclusion that the transaction was not entirely "fair, just, and reasonable" may well be drawn. When the fact is considered, also, that the trial court is in much better position to judge of the character of the conduct of the parties than an appellate court can possibly be, it is quite clear that we would not be justified in saying that the discretion given him by the law has not been rightly exercised.

It is claimed that the trial court erred in sustaining ob-

jections to certain questions asked by the plaintiff upon cross-examination of one of the defendant's witnesses. It is unnecessary to consider the objection at length. The questions did not relate to the conduct of the plaintiff, and, however answered, could not have affected the question of the plaintiff's right to demand specific performance.

*By the Court.*—Judgment affirmed.