JULES A. BLONDEL, APPELLEE, V. MARIE B. BOLANDER ET AL., APPELLANTS.

FILED JANUARY 8, 1908.   No. 15,023.

1. Specific Performance: FRAUD OF PLAINTIFF. Where it appears that a plaintiff, who brings a suit in equity to enforce a specific performance of a contract, has obtained such contract by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, or by any other unconscionable means, he will be denied affirmative relief.

2. ———: ———. Where a plaintiff, who, after having entered into a valid contract, has by means of sharp, unconscionable and fraudulent practices, and by a threat to repudiate the contract at a critical period during its execution, secured a change thereof greatly to his own advantage, brings a suit in equity for a specific performance of the contract as changed, he may not, after the court has determined the contract as so changed invalid for such misconduct, still prosecute such suit for the specific performance of the contract as originally made.

3. ———: CROSS-PETITION: ACCOUNTING. Where, in a suit to enforce a contract by a plaintiff who has obtained the same by means of sharp, unconscionable and fraudulent practices, the defendants claim as affirmative relief an accounting for rents received by the plaintiff, the maxim ."he who seeks equity must do equity" may be applied, and there may be deducted from the amount otherwise due the defendants for such rents the amount of money expended by the plaintiff in their behalf and the reasonable value of his services performed for their benefit.

4. Appeal: EVIDENCE: REVIEW. In a case tried to a court without a jury, the admission of improper evidence is not in itself ground for reversal; and, where this court finds it unnecessary to consider the evidence to which objection is made, it will not review the question raised by the objection to such evidence.

5. ———: ———: ———. In order to predicate error upon the rejection of testimony, the party complaining of its exclusion must have made an offer of what he expected to prove, which would indicate to the trial court the relevancy of the testimony, and, in the absence of such offer, the action of the court in rejecting the testimony will not be reviewed.

6. Pleading: AMENDMENT. It is the duty of a trial court to permit an

amendment to a pleading after the close of the testimony, when such amendment is in furtherance of justice and conforms to the proof, and the adverse party is not prejudiced by the delay in making the same.

APPEAL from the district court for Dakota county: GUY T. GRAVES, JUDGE. *Reversed with directions.*

*William P. Warner* and *Milchrist & Scott*, for appellants.

*Edwin J. Stason* and *R. E. Evans*, contra.

CALKINS, C.

John B. Arteaux died at Sioux City, Iowa, in the month of November, 1894, intestate, and possessed of considerable personal estate in Iowa, as well as two tracts of land situate in Dakota county, in this state, one of 160 acres, near Homer, and the other of 240 acres, near Jackson, sometimes called the "St. John land." The next of kin and heirs at law of Arteaux were his nephews Benoit Grezaud, Leon Grezaud, and Josef Beauvirronois, and his niece Francoise Jeandet, *née* Beauvirronois, all residing in the republic of France, and being of lawful age. The plaintiff, born in Switzerland, and familiar with the French language, resided in Sioux City. He was employed as an amanuensis by one Argo to write the heirs of Arteaux concerning their inheritance; and thereupon opened a correspondence with them on his own account, tendering them his services, and inviting them to his home, should they visit America. Benoit and Leon Grezaud thereafter came to this country, arriving in Sioux City in January, 1895. They went to the plaintiff's home, where they remained as his guests for several weeks, during which time the plaintiff and one Richardson were appointed administrators of Arteaux's estate in Iowa, and William P. Warner of Dakota City was appointed ancillary administrator of the estate in Nebraska. Shortly after the death of Arteaux, one Severson of Dakota county placed on record an instrument purporting to be a quitclaim deed for the

240-acre tract, executed by the deceased during his life-time to Severson. This deed was believed to be a forgery, and on the 17th day of January, 1895, Benoit and Leon Grezaud, on behalf of themselves and the other heirs, entered into a written agreement in the French language with the plaintiff, the material part of which appears from the translation in the record to be as follows: "Benoit and Leon Grezaud grant to J. A. Blondel the management and administration of the lands located in the state of Nebraska, under the following conditions: J. A. Blondel shall receive during two years, that is to say, until January 1, 1897, the income from these lands. He shall have to stand all taxes and keeping in repair which may be required by the farmer, and he pledges himself to make no new improvements without being authorized to that effect by the heirs. He pledges himself to sell it at a minimum price of $20 an acre, and the one of 240 acres at an undetermined price. In any case, it is agreed upon that they will be sold at the highest possible prices, and that a sale cannot be granted without the written authorization of the brothers and sisters of Grezaud and Beauvirronois, whatever may be the prices which shall be offered. In the case where in the appointed time the lands cannot be sold, the present agreement shall become void and without effect, and the heirs of John Baptiste Arteaux would take back the possession of them and would dispose of them as would seem fit to them. As for the land of 240 acres, concerning which a question of ownership is raised, it is agreed upon that J. A. Blondel will take to his charge all of the expenses of court proceedings and of justice which can be occasioned in order to claim back the ownership of it and free it from all liabilities; J. A. Blondel would be entitled to half part of the price of the sale of this land, and, in case of failure, the heirs of J. B. Arteaux shall have positively nothing to pay. If J. A. Blondel has not done what is necessary in order to reclaim that ownership in the delay of two years, the heirs keep all their rights of this land, and reserve to themselves to make the best

of them, when they wish and when they please. It is agreed upon in case of sale it will take place for cash; that the funds shall be deposited in a permanent bank of Sioux City; that the heirs shall be notified by this bank of the depositing of these funds before they send the titles signed by them, in order to definitely close the sale. In the case where Mr. Warner should have as administrator the income of said lands, the said J. A. Blondel pledges himself to forsake the incomes of these lands during the time of the administration of Mr. Warner."

About the 1st of February, 1905, the brothers Grezaud returned to France, taking with them a formal power of attorney to the plaintiff, to be executed by all the heirs. This instrument, with some alterations, was afterwards executed by the heirs; but, it being conceded that its only office was to affirm and ratify the contract of January 17, it need not be further considered. Immediately after the departure of the brothers Grezaud for France, the plaintiff retained Messrs. Lohr, Gardiner & Lohr, attorneys, to prosecute the suit against Severson and his grantees to quiet the title to the 240-acre tract; and later, and on about the 27th day of February, 1895, entered into a formal agreement with said firm to institute such suit in the circuit court of the United States for the district of Nebraska. They were to receive as compensation for their services, contingent upon the successful termination of the suit, an undivided one-sixth interest in the land, the plaintiff to advance and pay court costs, officers' and witnesses' fees, including the traveling and incidental expenses incurred by the said attorneys in prosecuting said cause. In the event of an appeal to the circuit court of appeals, the attorneys were to receive an undivided one-fifth interest; and, if the case were further carried to the supreme court of the United States, an undivided one-fourth interest in the land.

It seems that the plaintiff undertook to keep the Arteaux heirs advised of the progress of their affairs, and frequently wrote them after the return of .Benoit and Leon

Grezaud to France. In the letters purporting to be written for that purpose the plaintiff represented the dangers and difficulties of the case as continuously increasing, until it finally became almost hopeless. In a letter written November 19, 1895, he threatened to abandon his undertaking, unless the heirs would relinquish to him all the rights they had in the 240-acre tract. To this Benoit Grezaud replied, consenting to execute a quitclaim deed to the property, abandoning the land to the plaintiff. The plaintiff forwarded to him a quitclaim deed for execution; but before the same was executed Leon Grezaud died; and shortly after his death, in the latter part of 1897 or early in 1898, Benoit died. The death of the two brothers and other circumstances delayed the signing of the quitclaim deed, and, the heirs becoming dissatisfied, it was never executed. The Severson case was tried in 1897, and a decree rendered in June of that year in favor of the Arteaux heirs, from which decree no appeal was taken.

In 1896 John J. Tracy and another set up a claim to the land in controversy, claiming to have the title by patent, and instituted a suit in the district court for Dakota county against the Arteaux heirs, making Severson and his grantees parties. The plaintiff, through his attorneys Messrs. Lohr, Gardiner & Lohr, defended this suit in the name of the heirs, was defeated in the lower court, appealed to the supreme court, and secured a judgment of reversal. During the year 1899 the Arteaux heirs sent Mr. Arthur Valois, an attorney having offices in Paris and New York, to investigate the affairs of the estate. Mr. Valois employed Mr. Milchrist, one of the attorneys for the defendants in this case, to look after the interests of the heirs and take charge of their property. Meanwhile it appears that Lohr, Gardiner & Lohr had brought an action to recover their compensation, and the surviving heirs settled with them, paying them $1,300 attorneys' fees, and paying Mr. Warner $100. They also settled the Tracy suit, paying them the sum of $500 for the release of their claims.

After this the plaintiff brought this suit to enforce the specific performance of the agreement in the letter of Mr. Benoit Grezaud of December 25, 1895, in which he consented to abandon to the plaintiff all the interest of the heirs in the 240-acre tract. The defendants claim that the contract in question was not ratified by the other heirs, was without consideration, and was obtained by fraud, deceit and concealment; that the plaintiff was not entitled to recover on the original contract of January 17, 1895, because he had not carried out the same; and that he had received a large amount of rents over and above that contemplated by the agreement, for which he should account. The district court found that the contract of January 17 had not been changed, and that, by reason of the manner in which the parties had treated the same, time was not of its essence, and that it remained in full force and effect; that the subsequent correspondence on the part of the plaintiff was deceitful and fraudulent, and that the subsequent contract was without consideration. The court held that the defendants were subrogated to a one-sixth interest in the land by reason of the payments to Lohr, Gardiner & Lohr; and that the plaintiff was entitled to an undivided two-sixths interest under the contract of January 17, incumbered, however, by the amount of money which the defendants had paid to Mr. Warner and the Tracys. In respect to the rents, the district court found the evidence insufficient to enable it to adjust the same, and taxed the costs equally to the plaintiff and defendants. From this judgment the defendants appeal, alleging error in the court's awarding the plaintiff any portion of the land, and in its refusal to charge the plaintiff with rents collected. The plaintiff files a cross-appeal, complaining of the finding of the court that the contract for the whole of the 240-acre tract was obtained by fraud and misrepresentation, and was without consideration; and from so much of the decree as charges the plaintiff with the amount paid to settle the Tracy litigation.

1. It is contended by the defendants that the promise

contained in the letter of Benoit Grezaud of December 25,
1895, in which he acceded to the demand of the plaintiff
that the heirs should abandon all their interest in the
240-acre tract, was without legal consideration, and pro-
cured by fraud, deceit and in the exercise of bad faith on
the part of the plaintiff. It is one of the maxims of equity
that he who comes into equity must come with clean hands.
This maxim is much more efficient and restrictive in its
operation than the maxim, he who seeks equity must do
equity. It assumes that the suitor asking the aid of a
court of equity has himself been guilty of conduct in viola-
tion of the fundamental conceptions of equity jurispru-
dence, and therefore refuses him *all* recognition and relief
with reference to the subject matter in question. "It says
that whenever a party, who, as *actor*, seeks to set the
judicial machinery in motion and obtain some remedy, has
violated conscience, or good faith, or other equitable prin-
ciple, in his prior conduct, then the doors of the court will
be shut against him *in limine;* the court will refuse to
interfere on his behalf, to acknowledge his right, or to
award him any remedy." 1 Pomeroy, Equity Jurispru-
dence (3d ed.), sec. 397. This maxim is most frequently
applied in suits like this, for a specific performance of
contracts. A contract may be perfectly valid and binding
at law; it may be of a class which brings it within the
equitable jurisdiction, because the legal remedy is inade-
quate; but, if the plaintiff's conduct in obtaining it, or in
acting under it, has been unconscientious, inequitable, or
characterized by bad faith, relief should be denied him.
*Lewis v. Holdrege,* 56 Neb. 379. "By virtue of this princi-
ple, a specific performance should always be refused when
the plaintiff has obtained the agreement by sharp and un-
scrupulous practices, by overreaching, by concealment of
important facts, even though not actually fraudulent, by
trickery, or by any other means which are unconscien-
tious." 1 Pomeroy, Equity Jurisprudence (3d ed.), sec.
400. See *Lewis v. Holdrege, supra.* We cannot escape the
conviction that the plaintiff's conduct in obtaining this

promise has been unconscientious, inequitable, and characterized by bad faith; that the agreement of December 25 was procured by sharp and unscrupulous practice, by overreaching, by concealment of important facts, and by taking undue advantage of his position.

The transaction between the parties must be considered in respect to their situation; that the defendants were citizens and residents of a foreign country, ignorant of our laws, language, manners and customs; that they had reposed confidence and trust in the plaintiff, and depended upon him to truly advise them of the condition of their affairs in this country; that he was their agent and owned to them a duty which is incumbent upon a person in a fiduciary relation. We do not lose sight of the contention by the plaintiff that he was not the agent of the defendants. Whether the contract of January 17, 1895, created that relation it is not necessary to determine. In the contract with his attorneys he assumed that such a relation existed, and he cannot, after such assumption, deny it to his own advantage. The plaintiff's letters of February 14, April 15, and June 18, 1895, indicate that he either was discouraged with the obstacles encountered in the litigation and had lost all confidence in the integrity of the courts and juries of Nebraska, or that he pretended such discouragement and loss of confidence, and was attempting to deceive the defendants into the belief that they could have little hope of securing justice in this country. On September 5, 1895, the plaintiff wrote to Mr. Benoit Grezaud a letter, which appears from the translation in the record to be as follows: "Sioux City, Sept. 5, 1895. Mr. Benoit Grezaud: The suit concerning the land of Jackson against Severson goes forward smoothly, and, although I have spent already about $400 in the suit, I think this will be my loss. I can assure you of one thing, and that is that, if I had known all I now know, I should never have entered into this suit, for, even if we succeed in reclaiming the land, that will cost me as much as it is worth. Your uncle's title to this land is not good, for there are several

mistakes, and Severson, who had seen it, knew that. It is also the reason why these people of Jackson used to say always that your uncle had no good title, and that this land did not belong to him. Your uncle had bought a tax certificate for $13, and, as this certificate had never been refunded after three years, he had received a title which we call a 'title of tax sale,' and which in most part of the states is as good as any other. In Nebraska, however, these titles are not good for much, unless you occupy the land and cultivate it, a thing which your uncle has not done, and, what is more, the title of your uncle has been badly executed. If we should win the suit against Severson before having a good title, we shall still have one dozen other lawsuits on our hands with other people who claim each of them to be owners of some acres, and to whom I am certain we shall have to pay a certain amount for their claims. I went and saw the land, and I have found that on the corner is located the cemetery of Jackson, occupying about ten acres, and on the south side the Missouri has eaten away a corner, measuring about 20 acres, which leaves about 200 acres in all. From 80 to 100 acres are bottom lands and of good quality, but the remainder can be used only for pasture, and bad pasture, for the hills are too high and too steep. I do not like to allow Severson to have carte blanche, for, if I should give up the lawsuit now, he would prosecute me for malicious prosecution, and obtain judgment against me. I do not like either to spend much more money with so small a chance for return, for, at the best, my expenses will equal what I shall receive, and it will be a long time before we have a good title which will allow us to realize. Would you consent to take the suit into your hands and refund to me what I have already spent, if you should win? I even would be prepared to give you the profit of what I have already spent and allow you to continue the suit, rather than allow Severson to have carte blanche. As for me, however, it would be difficult to continue the action on the conditions we have made, for, at the best, I will have spent as much if

not more than my half will be worth, and I shall have all of my time lost, as well as much anxiety and dangerous enemies to take care of. Thus, if I must take nine chances out of ten, not only to lose my time and money, but to make dangerous enemies (for Severson has already killed two men, and has also poisoned his brother-in-law in order to be able to defraud his own sister), and, at the best, if we succeed, to pay more than the full price for the part which will come to me, I prefer, as I told you above, before incurring larger expenses, to leave the whole matter with you now, giving you the benefit of what I have done up to today. When you were here, I had not seen the land, which I thought to be good, nor the title, which I thought to have been executed as it should have been. I was positive that Severson was a forger of the worst kind, a dangerous man, who should have been hung long ago, and I am still more positive now. That is why, thinking I would save you a loss of money, I offered to take the suit by half. I thought then I would be able to find lawyers who would take charge of it cheap, but it has been impossible for me to arrange in that manner, for every lawyer was expecting to make big fees out of the estate, and then I have begun by paying everything myself. Now I have spent about $400, and have done but very little, for the court of the United States proceeds slowly in these lawsuits, which are numerous, and I see almost no possibility of recovering, or, even if we should win our suit, my expenses will be higher than my profits and all of my time and work will be for nothing. As my means do not allow me to work for justice's sake, I prefer to give up the affair now before incurring higher expenses, and, if you want to go forward with the suit, rather than see that scoundrel Severson keep the land unmolested, I will give you the profit of what I have done already, and, if you should win the suit, you will refund, and, if you lose, it will be my loss, and I will be the wiser another time. It will cost still, at least, from $500 to $800 before it is ·finished. This, as you see, with what I have already spent,

will amount to more than $1,000.  We are obliged to buy
our evidence, without which we could do nothing.   For
instance, a notary who has made the deed of your uncle
to Severson will give us his testimony if we pay him $300,
but, if not, he will give it in favor of Severson, and we will
be lost, for he can say that he has never made that deed;
as also he can tell that everything was in good order.   The
lawsuit is in Omaha, and we will be obliged to have all of
our witnesses over there for a few days; to pay their
transportation and return; to keep them in a hotel, and
also to pay them $3.50 a day for their time.   As we have
a score of witnesses that is going to cost dearly.   Thus
you see, dear Mr. Grezaud, the reason which prompts me
to give up continuing the suit.   If you take the suit to
a good end, you will have a full interest.   The expenses, I
believe it honestly, will amount to $1,500, and the land
will not sell for more than $2,000 with the title you will
be able to give.   In your next letter let me know what
you are going to do, for if you go forward yourself it is
necessary to take the testimony of the notary, who is
waiting now in order to know what to do.   You are going,
without doubt, to find it strange that a notary can be
bought, but Severson has foreseen that, and he used an
unscrupulous notary for his transaction, and it is the one
who will pay best who will get his testimony.   Finally,
enough on that subject, but let me know what you want
to do."

In this letter the discouragements which the plaintiff
had met in the prosecution of the suit to quiet title were
grossly exaggerated.   Some of the statements of fact—
e. g., the allegation that he had at that time spent $400—
are proved to have been absolutely false.   It was well
calculated to dishearten the defendants and make them
believe the case much more hopeless than it actually was.

In reply to this letter, Benoit Grezaud on October 24,
1895, wrote a letter, of which the following translation
appears in the record: "Pont de Vaux, Oct. 24, 1895.   My
dear Mr. Blondel: Regarding the farm at Jackson, it is

absolutely impossible for us to take that affair on our own account, as you propose to us. How do you expect that we, being strangers, not knowing the language of your country, might carry it to good end, if you, being there, acquainted with the laws of the country, cannot carry it through? We would prefer to abandon it entirely, rather than running the risk of a suit. It is for that reason that we had offered to give you one-half of the proceeds of that sale of the land, if you would revendicate the property at your own costs, perils, risks, refraining to undertake any- thing should you think of not being able to succeed, it is what you have accepted by the contract we made together. Inasmuch as the costs will be more considerable than you thought, and that even in case of success the half of the proceeds of this sale would not be sufficient to cover them, we will, if you think having any chances to win, and if consequently you are willing to go on with the suit, give you two-thirds, instead of one-half, but cannot do any better. If you have any doubts of success with prospective expenses as large as you say, perhaps it would be better to abandon the affair altogether, rather than exposing yourself more. We would deplore to see you obliged to pay those costs in pure loss and with much annoyance. We always thought that for you it would be a source of profits, and would not that it be otherwise."

The plaintiff's letter of September 25 had evidently pro- duced the effect which might have been foreseen, and impressed the defendants with the belief that the difficul- ties were much greater than had been anticipated. The plaintiff was not, however, satisfied with their offer to increase his compensation to a two-thirds interest in the 240-acre tract. Their liberality only made him more rapa- cious; and on the 19th of November, 1895, he wrote them a letter, which appears from the translation in the record to be as follows:

"Sioux City, November 19, 1895. Monsieur Benoit Grezaud: I understand your judgment regarding the Sev- erson matter, and, although my great desire is to abandon

that affair now, to save you much annoyance and a certain loss of money, also to act loyally with you, must keep at the task, and to bad game show good heart, by paying the expenses, growing right along, up to the time of an answer from you to this letter. The suit, as you understand, although I am paying all the expenses, is brought in your name proper as heirs of the land in question. This was the only way to have a standing in court, for you alone have the rights of revendication. No one here knows that I am paying the expenses out of my own money, and every one wishes to make good fees. I have three law firms at Sioux City and two at Omaha interested in this suit, and up to this time have spared neither time nor money to carry to good end this suit, but the circumstances are difficult to overcome, for the law favors Severson, and we must furnish the proofs. Your uncle is now dead, and Severson has many rogues to help him by false testimonies. I would abandon the suit now, but Severson would immediately begin a civil suit against you for malicious prosecution, and it would be easy for him to recover a judgment against you for a few thousand dollars for damages to his reputation and the harm done him by this suit. As this suit would be at Dakota City it would be easy for him to arrange a jury who would be favorable to him, and would give a judgment for a few thousand dollars. So you will understand immediately why it is impossible to quit, even with a poor assurance to carry to good end this suit, and spending more money than it will bring if we win. My lawyers have notified me last week that your uncle's title to that property is so poor that, if we win this suit, the only thing left for us to do to strengthen our title is to take possession of the place and cultivate it for a period of ten years consecutively, after which time we would have what we call an adverse possession title; that is, if you stay on a piece of land having a poor title for ten years and cultivate it, you are recognized in law as the legitimate owner. Your uncle had possession of it for 18 years, but cultivated it in part

only during the last five years.  So, supposing that the land comes back to us, for the next ten years it will be impossible to sell it, for, the title not being good, no one would buy it, as cheap as it may be.  With Severson for neighbor, it will be difficult to rent it advantageously, for the farmers are afraid of him and do not want to incur his enmity, being afraid that he may set fire to their home or poison their cattle.  Besides this, there will be several other suits with individuals claiming small pieces having been bought while this land was a part of the village of St. John.  So you see that what together we thought would be a matter of mutual profits will be, at the best, a source of loss, seeing that there will be other suits to begin, and that, even if I win the game, my money will be tied up in that bad deal for ten years, a thing not very profitable for a person who has but little of it.  Then during that time one can die many times, and I would not let as complicated an affair to my wife.  Here are then, everything considered, the conclusions to which I come: Either I continue the suit, to lose all, but saving you from the annoyance almost certain of a suit and a judgment against you by Severson for a good amount, or I'll abandon the affair now, saving myself an expense of at least $1,000 with small assurance of success, and leaving Severson in peaceful enjoyment of the product of his theft (which he declares having paid cash and good money), and leave him the privilege to begin a suit against you as above mentioned.  The choice is yours, but only under one condition will I follow my first proposition.  If you wish me to continue, you will make me a contract by which you as heirs of John B. Arteaux relinquish in my favor all the rights that you have upon that piece of land if I carry to good end the lawsuit.  Seeing the large amount of money which I must advance in this matter, the long period of time which I will have to wait before realizing, and the numerous annoyances which I will have and have had, added to the incertitude of return at all, it is only just to me that I should have such guaranty, or else that

I should quit before spending more money. My desire is to abandon the case, even if you accept my proposition, and I may assure you that, were it not for the fear of bad lawsuit to you, it would take me but a couple of minutes for a decision."

The mere reading of this letter, in the light of the facts already stated, shows that it was a gross exaggeration of the dangers and difficulties of the litigation. It was in some parts a misstatement of the facts, as where he states that he had employed three law firms in Sioux City and two in Omaha, and was endeavoring to create the impression that he had a large liability for attorneys' fees, when, in fact, his attorneys had undertaken the case upon a contingent fee, and he had no such number engaged. The statement that he was advised by his attorneys that the heirs would have to take possession and cultivate the land for ten years was untrue; and we cannot believe the plaintiff to have been under the apprehension of danger from a suit by Severson which he represents in this letter. When examined upon the stand in reference to this matter, he admitted that he only feared a suit from Severson in the event that the case was dropped or abandoned.

It was in response to this letter that Benoit Grezaud on December 25, 1895, wrote the following: "Pont de Vaux, December 25, 1895. My dear Mr. Blondel: Regarding the affair, Severson, when we treated with you for the land of St. John, we thought that it would be for you a source of profit, and we had thought to understand that you would easily end that lawsuit to reclaim the title. It is for that reason that we had consented in case of success to give you half of the price of the sale of that land. If we had been able to suppose it was as long and difficult we would have immediately abandoned it to Severson, rather than make you run the chance of this lawsuit and to expose ourselves to the annoyance of which you speak to us. As we do not wish in any manner to intervene in

38

this affair, we consent to abandon to you the totality of our rights upon that land as you ask it of us. If you think doing by continuing the suit, it is your business, for we will not enter in any cost whatever, neither directly nor indirectly. If you need an abandon (quitclaim deed) in due form, kindly make it and send it to us to sign, being careful to stipulate that you take to your own charge all the costs made, or to be made, and all the claim that Severson could make. You will inclose also a French translation."

This letter is the foundation of the plaintiff's claim, the contract of which he is asking a court of equity to require of the defendants the specific performance. Can it be said of the plaintiff that he stands in conscientious relations toward the defendants, and that his claim under this contract is fair and just? Here we find him, after having entered into a binding contract with the defendants, after having taken possession of their property, after having involved them in litigation, deliberately saying to them: "Give to me the entire subject matter of this litigation, or I will repudiate my contract, I will withdraw from and abandon your suit and your interests, though the consequences of my act will inevitably be the entire loss of the property and a judgment against you for damages." No contract so obtained can be enforced in a suit of equity; and the plaintiff should be denied the relief demanded upon the evidence of his letter of November 19, 1895, alone.

2. It is contended by the plaintiff that he is entitled to a one-half interest in the 240-acre tract under the contract of January 17, 1895, even if it should be held that the contract of December 25 was obtained by fraud or by such unconscientious means as would deprive him of a right to enforce a specific performance thereof in equity. We thus have presented the question whether a plaintiff, who, after having entered into a valid contract, has by means of sharp, unconscionable and fraudulent practices, and by a threat to repudiate the contract at a critical

period during its execution, secured a change thereof greatly to his own advantage, and brings a suit in equity for the specific performance of the contract as so changed, may, after the court has determined the change invalid, still prosecute his suit for the specific performance of the contract as originally made. The maxim that he who comes into a court of equity must come with clean hands means that such court will not enforce, on behalf of a plaintiff whose own conduct in connection with the same matter or transaction has been unconscientious, or unjust, or marked by want of good faith, or who has violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain, a contract so obtained. 1 Pomeroy, Equity Jurisprudence (3d ed.), sec. 398. It is to be observed that the conduct which will deprive the plaintiff of a right to resort to a court of equity for the relief to which he would otherwise be entitled must be in connection with the same matter or transaction. It is said that the maxim considered as a general rule controlling the administration of equitable relief is confined to misconduct in regard to or connected with the matter in litigation, and this is the only limitation of which we are aware. The misconduct of the plaintiff in this case is in connection with the relation of the parties under the contract originally entered into, and it therefore falls within the rule given for the application of the maxim. It is also, we believe, within its spirit. A court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, and it no less stringently demands the same from the litigant parties who come before it as parties or actors in such controversies. To allow a party, who fraudulently secures the alteration of a contract to his own advantage and brings a suit in equity to enforce it as altered, to proceed upon the original contract when the fraudulent character of his alteration is discovered, would be, it seems to us, to place a premium upon such

conduct, and we are satisfied that it should not be permitted.

3. The defendants in their answer demand as affirmative relief an account of the rents received by the plaintiff for the land in question, as well as for the 160-acre tract near Homer. It appears that the plaintiff received rents of the former for the years 1896 to 1900, inclusive, amounting to $1,078, and of the latter from 1895 to 1899, inclusive, amounting to $1,225, a total of $2,300, but the plaintiff expended of the moneys so received by him a considerable amount for the benefit of the defendants in carrying on the litigation, and in payment of expenses, taxes and repairs. To this part of the controversy the maxim that he who seeks equity must do equity may be applied, and we are of the opinion that the defendants should not be given this affirmative relief, unless they are willing as a condition thereof to credit the plaintiff with the expenditures he has made for their benefit. While this willingness is not expressed in the pleadings, the defendants in their brief consent to the plaintiff's being allowed for the expenditures he is shown to have made, and give a qualified consent that he be allowed a reasonable sum for his services. There is a sharp disagreement between the counsel for plaintiff and the defendants as to the amount of money received and paid out by the plaintiff, and we have been compelled to examine the record upon this question. While the evidence is not as clear and satisfactory as could be desired, we think that a finding that the amount paid by the plaintiff, added to the value of his services if he were to be compensated on a *quantum meruit*, would equal, but not exceed, the amount collected by him for rents would be fairly sustained by the evidence. We therefore conclude that, since the amount of the plaintiff's disbursements for, and the value of his services to, the defendants equal the amount of rents collected by him, the defendants are not entitled to recover anything on that account.

4. The plaintiff objected to certain interrogatories propounded to the defendants when their depositions were

taken, on the ground that they were not proper under the rule that cross-examination is limited to an inquiry into the facts and circumstances connected with the matters stated in the direct examination. It is well established in this state that, in a case tried to a court without a jury, the admission of improper evidence is not in itself ground for reversal. *Smith Premier Typewriter Co. v. Mayhew,* 65 Neb. 65. If there is sufficient competent evidence to support the finding of the trial judge, it will be presumed that he did not consider improper evidence found in the record. We have not found it necessary to consider the evidence objected to in making a disposition of the case, and it is not, therefore, required that we determine the question whether this evidence was properly admitted or not.

5. On the trial the plaintiff was interrogated while upon the witness stand as to conversations had with Benoit and Leon Grezaud. This testimony was objected to, on the ground that the questions called for a conversation between the plaintiff and a deceased person, of whom some of the defendants were personal representatives. This objection was sustained, and of this ruling the plaintiff complains. There was no offer by the plaintiff indicating what he expected to prove by the witness in response to the questions propounded and overruled, and we are unable to say whether the same were material or would have in any manner affected the case. It is well settled in this state that, to predicate error upon the rejection of testimony, the party complaining of its exclusion must make an offer of what he expects to prove which will indicate to the court whether the proposed testimony relates to relevant facts; and, in the absence of such offer, the action of the trial court will not be reviewed. *Barr v. City of Omaha,* 42 Neb. 341, and cases there cited.

6. The original answer charged the plaintiff with making the statements contained in the letters quoted in the first paragraph of this opinion; alleged that they were false and fraudulent, and made in bad faith; denied the

Blondel v. Bolander.

making of the contract to give the plaintiff the whole, instead of the half, of the 240-acre tract. After the evidence was in, the defendants asked for and obtained leave to amend their answer so as to admit the writing of the letter of December 25, 1895, by Benoit Grezaud, but alleging that he was induced to write such letter by the false and fraudulent statements of the plaintiff as charged in the original answer. Of the action of the court in allowing this amendment the plaintiff complains. Under section 144 of the code, it becomes the duty of the court in the furtherance of justice, and on such terms as may be proper, to amend any pleading by conforming the same to the facts proved. It is not suggested that the plaintiff was in any way prejudiced by the allowance of this amendment at this time; the case having been litigated between the parties in the same manner as if the answer had been the same at the beginning of the trial as it was after the allowing of the amendment. The answer as amended conforms to the proofs, and the amendment was made in the furtherance of justice.

We therefore recommend that the judgment appealed from be reversed and the cause remanded, with instructions to the district court to enter a judgment. (1) Dismissing the plaintiff's action, with costs, and quieting the title to the 240-acre tract in the defendants; (2) dismissing the defendants' counterclaim for rents.

Fawcett and Ames, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment appealed from is reversed and the cause remanded to the district court, with instructions to dismiss the plaintiff's action, with costs, quieting the title to the 240-acre tract in the defendants, and dismissing the defendants' counterclaim for rents.

Reversed.