### GREISON v. WINEY.

(District Court, S. D. Iowa, Davenport Division. June 11, 1915.)

1. SPECIFIC PERFORMANCE ⬥⟿8—RIGHT OF PLAINTIFF.

Specific performance of a contract is not a matter of right, but of the discretion of the court, which will be exercised only when the plaintiff shows a perfectly fair contract, free of misrepresentation, fraud, or misapprehension.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 17, 18; Dec. Dig. ⬥⟿8.]

2. SPECIFIC PERFORMANCE ⬥⟿53—CONTRACT TO PURCHASE LAND—INEQUITABLE CHARACTER.

Where the agent of a real estate firm, seeking to sell land for such firm and the plaintiff, falsely induced defendant buyer to believe that he, the agent, was a man of wealth, and was seeking to dispose of his property solely because of his age, and that the buyer could make some money by acting as his agent, inducing him to go and inspect the properties, and finally, not because the buyer wished to purchase, but because a purchase of the land would be an inducement to others to invest, the buyer was brought to consider making such purchase, but finally refused to do so until the agent, who was insolvent, gave him a contract agreeing to refund the money paid under the contract, with 6 per cent. interest, if demanded within a year, the contract of sale could not be specifically enforced by the plaintiff, for whose benefit it was made in part, as it was unconscionable and procured by fraud and false pretenses.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 160–171½; Dec. Dig. ⬥⟿53.]

3. SPECIFIC PERFORMANCE ⊜⟶53—FRAUDULENT CONTRACT.

  Where the owner of land authorized a real estate firm to sell it, which employed an agent, who made a contract of sale with the buyer which was fraudulent, in that such agent, who was insolvent, represented himself as wealthy, and gave the buyer an agreement to refund the purchase price, with interest, if demanded within a year, the owner could not specifically enforce such contract against the buyer free of the equities created by the agent's acts, since his rights depended on the validity of the contract, which was vitiated by fraud.

  [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 160–171½; Dec. Dig. ⊜⟶53.]

In Equity. Suit by C. H. Greison against R. M. J. Winey. Petition dismissed.

Arthur W. Fowler, of Fargo, N. D., and F. D. Letts, of Davenport, Iowa, for complainant.

Lane & Waterman, of Davenport, Iowa, and Skinner & Coe, of Clinton, Iowa, for defendant.

WADE, District Judge. This is an action for specific performance. Perley & Lincoln, of Moorhead, Minn., were real estate agents, and on June 5, 1913, made a contract with the plaintiff, C. H. Greison, by which they became the agents of said Greison for the sale of a section of land in North Dakota, the terms of which will hereafter be referred to. On August 13, 1913, Perley & Lincoln entered into a contract with R. M. J. Winey, defendant herein, under which the defendant undertook to purchase said section of land. In order to induce Winey to enter into said contract, L. G. Lincoln, one of said partners, executed the following agreement:

"Moorhead, Minnesota, August 13, 1913.

"L. G. Lincoln, first party, and R. M. J. Winey, second party, for a valuable consideration hereby agree as follows:

"That whereas, the said Winey has this day purchased all of section 5, township 143, of range 49, Cass county, North Dakota, at price and on terms as stated in a certain agreement of this date, executed by and between the firm of Perley & Lincoln, as first parties, and the said Winey, as second party:

"Now, then, if at any time within one year from this date said Winey desires to be relieved of his purchase of said premises, and receive instead the money paid by him for the same, the said Lincoln shall, upon notification from said Winey of said facts, repay to the said Winey, within 90 days from and after the date of said notification, all the money that he has paid out on account of said purchase price, together with interest thereon at the rate of 6 per cent. per annum from this date, upon receiving from said Winey an assignment of his contract for said land, and all his right, title, and interest therein. "L. G. Lincoln.

"R. M. J. Winey."

On September 3, 1913, Winey sent to Perley & Lincoln the following letter:

"Charlotte, Iowa, Sept. 3, 1913.

"Messrs. Perley & Lincoln, Moorhead, Minnesota—Gentlemen: I desire to be relieved of the purchase of all of section 5, township 143, range 49, Cass county, North Dakota. I demand that the $3,500.00 sent to the Moorhead National Bank be paid to Greison be returned to me. This is in accordance with the agreement entered into by and between L. G. Lincoln and myself, and for account of Perley & Lincoln, under date of August 13, 1913, a copy of

which contract has been sent to the Moorhead National Bank and demand made upon them to return said funds.

"Yours very truly,                                      R. M. J. Winey."

The defendant continuing to refuse to perform the contract made by him with Perley & Lincoln, C. H. Greison, the plaintiff, brought this action for specific performance. The defendant relies upon numerous defenses, including fraud and misrepresentation, failure to furnish an abstract showing marketable title, that the transaction is unconscionable, misdescription, etc.,

Perley & Lincoln are a copartnership; Perley being an attorney, who has practiced law for many years, and who, from his appearance upon the witness stand, is a man of good ability and keen perception. The defendant, Winey, is a farmer, 78 years of age, living at Charlotte, Iowa, who from his appearance and testimony as a witness is of less than average normal ability, and is suffering from the weakness of old age. In my view of this case, it is not necessary to consider the numerous questions presented. It is only necessary to determine whether or not the transaction before the court is shown to be so free from fraud, deception, trickery, or overreaching as to be specifically enforced by a court of equity.

[1] It is well settled that specific performance is not a matter of right, but of discretion.

"The contract must be free from any suspicion of its bona fides." Thomas v. Brewing Co., 102 Md. 417, 62 Atl. 633.

"Specific performance should always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, or by any other means which are unconscientious." Blondel v. Bolander, 80 Neb. 531, 547, 114 N. W. 574, 580.

"Specific performance is not a matter of absolute right to either party, but rests in the discretion of the court, to be exercised on consideration of all the circumstances of each particular case. * * * The mere fact of the existence of a valid contract is not sufficient of itself to entitle the plaintiff to this relief, but the court has regard for the conduct of the parties and circumstances outside the contract." Brewing Co. v. Brywcznski, 107 Md. 696, 701, 69 Atl. 514, 516.

"Has appellant shown himself entitled to a specific performance of the contract, under the well-established rules of equity? Has appellant shown a perfectly fair contract, free from misrepresentation, fraud, or misapprehension, that does not evidence an unconscionable or hard bargain, and that is not in its performance oppressive upon appellee? Has he come doing equity at the same time that he is seeking equity; and has he come into court with clean hands? It cannot be said that a contract is fair, where it has been induced by false representations." Riggins v. Trickey, 46 Tex. Civ. App. 569, 102 S. W. 921.

"While there probably was not actual fraud on the part of the plaintiff, there was what might well be called 'sharp practice,' not pleasant to contemplate, and not calculated to appeal with favor to the conscience of the chancellor." Engberry v. Rousseau, 117 Wis. 52, 57, 93 N. W. 824, 826.

3 Pom. Eq. § 1405, states the rules governing actions of this kind as follows:

"It [the contract] must be, in general, mutual in its obligation and in its remedy. The contract must be free from any fraud, misrepresentation, even though not fraudulent, mistake, or illegality. The elements which peculiarly affect the equitable character of the agreement and of the remedy are the

following: The contract must be perfectly fair, equal, and just in its terms and in its circumstances. The contract and the situation of the parties must be such that the remedy of specific performance will not be harsh or oppressive."

In note 1 to section 1405 it is stated:

"If, then, the contract itself is unfair, one-sided, unjust, unconscionable, or affected by any other inequitable feature, or if its enforcement would be oppressive or hard on the defendant, or would prevent his enjoyment of his own rights, or would work any injustice, or if the plaintiff has obtained it by sharp and unscrupulous practices, by overreaching, by trickery, by taking undue advantage of his position, by nondisclosure of material facts, or by any other unconscientious means, then a specific performance will be refused. It necessarily follows that a less strong case is sufficient to defeat a suit for specific performance than is requisite to obtain the remedy."

In Smith v. Shepherd, 36 Iowa, 253, the court says:

"Specific performance will not be decreed if there is inequality and hardship in the contract, as against the defendant, or there be good reason to doubt if the defendant entered into it understandingly, or whether he might not have been suffering some degree of obscuration of clear perception by reason of intoxication. In such cases a court of equity simply refuses to interfere, leaving the plaintiff to proceed at law for any redress by way of damages to which he may be entitled."

In the case of Zundelowitz v. Webster, 96 Iowa, 587, 65 N. W. 835, the court says:

"The specific execution of a contract, in equity, is not a matter of absolute right, * * * which rests alone in the sound discretion of the chancellor—a discretion controlled by established principles of equity in view of all the facts and circumstances attending the case presented."

In Pope Manufacturing Co. v. Gormully, 144 U. S. 224, 12 Sup. Ct. 632, 36 L. Ed. 414, it is said:

"To stay the arm of a court of equity from enforcing a contract it is by no means necessary to prove that it is invalid; from time to time immemorial, it has been the recognized duty of such courts to exercise a discretion, to refuse their aid in the enforcement of unconscionable, oppressive, or iniquitous contracts, and to turn the party claiming the benefit of such contract over to a court of law. * * * 'Omission or mistake in the agreement, or that it is unconscientious or unreasonable, or that there has been concealment, misrepresentation, or any unfairness, are enumerated among the causes which will induce the court to refuse its aid.'"

[2] In this case I hold that Winey was induced to enter into the contract sued upon by methods and devices which should not receive the approval of a court of equity. Lincoln, one of the firm with whom the contract was made, came from Moorhead, Minn., to Charlotte, Iowa. He in some manner became acquainted with the son-in-law of Winey, who brought Lincoln to Winey's house. Lincoln represented himself to be the owner of 30,000 acres of land in North Dakota, and told Winey that he was anxious to dispose of it, because he was getting old, and he wanted to be relieved from the burden of attention which it demanded. He was endeavoring to secure buyers, but he was posing as a wealthy landowner. This is not disputed; in fact, one of the impressive things in this case is that Lincoln, who was present at the time of the trial, did not go upon the witness stand at all. This is of

special significance, because there was so much of the transactions between the parties of which he alone had knowledge.

Lincoln induced Winey to go around and introduce him to his neighbors with a view of securing purchasers, and endeavored to get Winey to act as agent, and with this in view induced him to go to Moorhead to look at the lands. There was no suggestion of a sale to Winey. It appears without dispute that he did not intend to purchase any property, and did not desire to purchase any property. Lincoln agreed to pay his expenses if he would go up there and look the country over with a view of qualifying him as agent, so that he could impress his neighbors with the value of the land and the opportunities for investment.

At Moorhead, Perley & Lincoln both took him in an automobile, and drove him about the country for a day or two, examining no particular tract of land, except the one described in the contract, but viewing the country generally. When they arrived at the section of land described in the contract, which was at some considerable distance from Moorhead and at that time was growing a fine crop of wheat and flax, they got out of the automobile, and walked across the land in different ways, so that a thorough inspection of it was made; but even at this time there was no suggestion to Winey that he was regarded as a land buyer, or that he was expected to buy.

After Winey had been there a couple of days, he was in the office of Perley & Lincoln, talking things over in a general way, when one of the partners proposed to him that he purchase this section of land. Winey said he did not want the land, and then they impressed upon him the fact that he was to act as their agent, and that he would be in a much better position to secure purchasers if he would show his confidence in the country by himself making an investment. This, according to the evidence, appealed to Mr. Winey, and yet he hesitated, and finally refused. Thereupon, in order to induce him to make the purchase, it was proposed that, if he would make the purchase, a contract would be executed by which, if he became dissatisfied within a year, he could have his money back, and that the contract could be returned, so that it would not cost him anything. There is a conflict in the evidence as to whether the proposal was made by Lincoln individually, or by the firm, and Winey claims that he understood that the firm was to be bound by the contract, which was in fact signed only by Lincoln; but in my view of the case, this is not material.

Upon this proposition, to give him a year in which to decide whether he should hold the property or not, Winey consented to the purchase. It is not seriously contended that he would have purchased, except for this particular arrangement. Thereupon the contract of purchase and the contract signed by Lincoln, heretofore set out, were prepared and signed, and Winey returned to his home. It now appears that there was good reason why the contract to relieve Mr. Winey of his purchase within the year was not signed by the firm. It appears that Lincoln is insolvent, or practically insolvent, while Perley was a man possessed of some property. It is not seriously contended, al-

though Lincoln was present in court, that the contract signed by Lincoln had any value, or that it could be enforced against him. In other words, it appears that, as inducement to purchase the property, Winey was led to accept a contract signed by an insolvent, who agreed with him to pay him the money which he was to advance upon the property and to relieve him of the obligations of the contract.

It will be observed that the contract of purchase and the contract signed by Lincoln were executed August 13, 1913. This contract is heretofore set forth in this opinion, and provided that:

"If at any time within one year from this date said Winey desires to be relieved of his purchase of said premises, and receive instead the money paid by him for the same, the said Lincoln shall, upon notification from said Winey of said facts, repay to said Winey, within 90 days from and after the date of said notification, all the money that he has paid out on account of said purchase price, together with interest thereon at the rate of 6 per cent. per annum from this date, upon receiving from said Winey an assignment of his contract for said land, and all his right, title, and interest therein."

The contract of purchase fixed the purchase price at $38,400, and under its terms Winey was to deposit $3,500 in the bank "as soon as convenient," and the balance of the cash, amounting to several thousand dollars, in addition to the payment reserved in the crop contract which Winey was to receive, was to be paid at threshing time in 1913. Between August 13, 1913, the date of the contract, and September 3, 1913, Winey had sent forward his $3,500 to be deposited in the bank, and there was correspondence in reference to the other details to comply with the contract, and the abstract of title had been procured and forwarded; but on that date, September 3, 1913, Winey wrote to Perley & Lincoln the letter heretofore set out in this opinion, electing to have the money returned, and to be relieved of his contract "in accordance with the agreement entered into by and between L. G. Lincoln and myself." Subsequent to this time there was other correspondence in regard to the abstract and in regard to the contract.

Without further stating the facts, from the foregoing it will appear that the defendant was induced by Lincoln to believe that he (Lincoln) was a man of wealth, and was seeking to dispose of his property because of his age, and that Winey could make some money by acting as his agent. He induced Winey to go to inspect the properties, and finally—not because Winey wanted to purchase, but because a purchase of a section of land would be an inducement to others to invest—Winey was brought to the serious consideration of making the purchase; but ultimately all these considerations failed, and Winey would not purchase, but in the end he yielded when the proposal was made to give him a year in which to determine whether he wanted to hold the property. Under the evidence, there is no question but that the Lincoln contract was the chief inducement which finally led Winey to enter into the contract; and now in a court of equity action is brought to enforce this contract so procured.

It should not need discussion to make it clear that the contract sued on was procured by fraud and false pretenses. Winey was led to believe that Lincoln was a rich man, and he was induced by Lincoln,

or by Perley & Lincoln to enter into the contract of purchase, by having Lincoln execute to him a contract which upon its face was absolute protection and indemnity against any possible loss, when in truth, so far as the record shows, the paper signed by Lincoln was worthless.

Winey was induced to sign a contract obligating himself to pay some $38,000 for land which he did not want, for the specific purpose of inducing persons to buy land through Perley & Lincoln, under a specific agreement that at any time within a year he could receive the money which he had paid and deliver up the contract; and now it appears that the contract was signed by an insolvent, who by falsehood and false pretenses had convinced Winey that he was a wealthy landowner, entirely responsible for his contracts. A contract thus obtained is not only unconscionable, but it is absolutely fraudulent. Greison bought this land May 2, 1912, on crop payments, at less than $40 per acre. He made a contract with Perley & Lincoln June 5, 1913, by which he authorized them to sell the land at $51 per acre. On August 13, 1913, Perley & Lincoln made the contract with the defendant at $60 per acre, and the evidence shows that Perley & Lincoln contemplated receiving the difference between the price fixed by Greison and the price agreed to be paid by Winey. These facts are significant in considering the whole transaction; but it is not necessary to go into a discussion of the details.

[3] Counsel in argument do not seriously contend that the Lincoln contract is of any value, nor can there be contention that Winey was not induced to accept it because of the false pretenses as to the wealth of Lincoln; but it is strenuously urged that this contract on the part of Lincoln, and any fraud connected therewith, is collateral to the contract, and not binding upon Greison. Counsel take the position that Greison's contract stands alone, and that any fraud connected with the contract with Lincoln cannot be a defense against Greison's action herein. But Greison never made any contract with Winey. The contract in suit is one made with Perley & Lincoln, and not with Greison. The contract in part is as follows:

"It is hereby understood and agreed by and between G. E. Perley and L. G. Lincoln, copartners as Perley & Lincoln, of Moorhead, Minn., first parties, and R. M. J. Winey, of Charlotte, Iowa, as follows."

Greison did not sign this contract, nor did Perley & Lincoln sign it as his agents. He is not a party to the contract. It is signed, "George E. Perley," "L. G. Lincoln," "R. M. J. Winey." It is a contract, of course, for the benefit, in part only, of C. H. Greison. Many of the provisions of the contract are purely personal between Perley & Lincoln and Winey. It is a contract, however, under which Greison can maintain action, because made for his benefit; but it is not a contract with him, and, if he brings suit upon the contract, it is subject to every defense which could be made against an action by Perley & Lincoln upon the same contract.

It can hardly be contended that, if Greison sues under a contract made by Perley & Lincoln, which contract was obtained by fraud, that the fraud cannot be pleaded as a defense. Greison's rights de-

pend upon the validity of the contract; fraud vitiates the contract, and especially is this true when, as in this case, the main inducement to the signing of the contract by Winey, was fraudulent. In view of the foregoing, it is unnecessary to consider the other defenses pleaded.

The court holds that the plaintiff is not entitled to specific performance. His petition is dismissed. Plaintiff excepts.