No. 16,130.

COLE *v.* LINDSEY.
(211 P. [2d] 544)

Decided October 24, 1949.

Mr. RICHARD E. CONOUR, ELIZABETH A. CONOUR, for plaintiff in error.

Mr. MERLE M. MARSHALL, for defendant in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

O. H. LINDSEY brought an action against L. B. Cole to recover judgment in the sum of $480.80, with interest thereon. Trial was to a jury, which rendered its verdict in favor of plaintiff and against defendant for the amount sought, and judgment was entered in accordance with the verdict. Defendant seeks a reversal here by writ of error.

It is alleged in the complaint that on or about February 1, 1946, plaintiff sold to defendant 296 sacks of potatoes at an agreed price of $2.30 per sack. Defendant paid $200 on the purchase price, and thereafter refused to pay the balance due under the contract.

Defendant answering, denied the contract to purchase, admitted the payment of $200 on March 14, 1946, and for a second defense alleged that plaintiff was a duly licensed dealer in potatoes, was not the producer thereof, and "that said sale of potatoes to defendant by plaintiff exceeded 7,000 pounds in amount." He further alleged that on or about March 14, 1946, plaintiff sold, and agreed to deliver, to defendant approximately 300 sacks of potatoes of 100 pounds each, at the agreed price of $2.30 per sack, which potatoes were expressly warranted to be of "U. S. No. 1" grade. He further alleged that on March 14, 1946, defendant, with plaintiff, sampled the potatoes where the same were stored; that the sacks were marked "U. S. No. 1" grade, and that thereupon, following the sampling, defendant agreed to purchase from plaintiff said potatoes and paid the sum of $200 on the purchase price thereof; the balance to be paid upon ascertainment of the amount due therefor. Defendant also set out in his answer, as part of his second defense, the legal and official rules and regulations establishing grades and standards for potatoes when the same were sold or offered for sale in amounts exceeding 7,000 pounds, and then alleged that on March 26, 1946, defendant took delivery of 93 sacks of potatoes and found the same to be "dirty, damaged, and badly affected by soft rot or wet breakdown" in excess of the maximum

amount permitted for "U. S. No. 1" grade. In a counter-claim defendant alleged that he was obliged to, and did, have the same "washed, re-sorted, graded and classified," and, as a result thereof, salvaged only 66 sacks of marketable potatoes from the 93 sacks received. He alleged that after discovering the condition of the potatoes he notified plaintiff that he would not accept the balance thereof nor pay for the same.

By his counterclaim defendant sought to recover the cost incurred by him in the washing, re-sorting, grading and classification of the potatoes, and further alleged that by reason of the unsalable condition of the potatoes he lost profits which would have otherwise accrued to him in the sum of $1,000, for which he asked judgment.

In his reply to the counterclaim, plaintiff denied all affirmative defensive matters alleged by defendant.

The record discloses that both plaintiff and defendant are licensed produce buyers and sellers, and the controversy giving rise to this action grew out of the sale by plaintiff of 296 sacks of potatoes to defendant. Plaintiff had purchased these potatoes from one Moore, the grower thereof, and on March 14, 1946, the potatoes were in new sacks bearing the legend "U. S. No. 1," and stored in bins on the Moore place. They had been sorted and sacked a few days before March 14, 1946, on which date plaintiff interested defendant in the purchase thereof, stating to him that the potatoes would grade U. S. No. 1 and that they might be purchased for $2.30 per hundred pounds, when the sale price of U. S. No. 1 potatoes was $2.60 or $2.70 per hundred. Plaintiff and defendant went to the Moore place and inspected the potatoes by sampling three sacks thereof, resulting in defendant purchasing the potatoes and paying on the purchase price thereof the sum of $200, stating that he would remove the potatoes within a few days after the date last mentioned. Neither plaintiff nor defendant secured a certificate of inspection as provided in section 74, chapter 69, '35 C.S.A.

On March 26, 1946, defendant took 93 sacks of the potatoes which he testified were in an unsalable condition as U. S. No. 1 potatoes because of moisture and rot, whereupon he had the potatoes washed and salvaged 66 sacks of the 93 sacks as salable potatoes. He testified that he stated to plaintiff before inspecting the potatoes that he would not be interested in the purchase thereof unless they were U. S. No. 1, and plaintiff admits that this statement was made. Defendant testified that plaintiff guaranteed the potatoes to be U. S. No. 1, and this statement plaintiff denies. After receiving 93 sacks of potatoes and discovering their unsalable condition, defendant testified that he notified plaintiff of their condition, and then repudiated his contract of purchase, while plaintiff testified that it was some considerable time after March 26, 1946, when he first was notified that defendant was dissatisfied with his contract and refused to be bound thereby. Plaintiff testified that the unsalability of the potatoes, if such condition existed, was due to defendant's delay in promptly disposing of them.

Excerpts from the rules and regulations specifying the condition and quality of potatoes entitling them to be classified as U. S. No. 1 grade, as adopted and promulgated by the Director of Markets, were offered and received in evidence.

At the conclusion of plaintiff's case in chief, and again at the conclusion of all of the evidence, defendant interposed a motion "to dismiss the plaintiff's complaint" or "direct a verdict" or "enter a nonsuit," the motion being as follows: "For the reason that the undisputed testimony of the plaintiff shows that the sale for which this action is brought was an illegal sale contrary to the mandatory requirements of Chapter 69 of the 1935 statutes, as amended; that is the 1935 Statutes Annotated, as amended, in that he failed to comply with the inspection law governing the sale of potatoes in an amount exceeding 7,000 pounds at the time he offered for sale and sold the potatoes in question and for that

reason cannot recover in this action." Ruling upon the motion was reserved.

The jury returned its verdict in favor of plaintiff, and the court entered judgment thereon for the "sum of $509.65 * * * together with his costs * * * laid out and expended."

There are five specifications of points upon which defendant relies for a reversal herein, all of which may be considered, as defendant states in his brief, under the following: "This writ of error involves a case of first impression in Colorado upon the question of whether or not the Marketing Act, Chapter 69, secs. 60-101, 1935 C.S.A. controls a sale of this nature, and whether or not a sale not in conformity with the provisions of the Act and of the regulations of the Colorado Director of Markets may result in recovery of the purchase price where the produce sold is inspected by the purchaser before agreement to purchase. Plaintiff in error contends that such a sale is illegal and no recovery can be had."

Defendant, as we understand it, presents two questions for our determination: 1. Are the provisions of Article 9, chapter 69, '35 C.S.A., applicable to this transaction? 2. May plaintiff recover judgment for the unpaid balance due without complying with the provisions of Article 9, chapter 69, '35 C.S.A., even though defendant examined and sampled the potatoes prior to his agreement to purchase the same?

There were eighteen instructions given to the jury, to none of which was any objection made, and, while we are not here called upon to pass upon the instructions, nevertheless our silence should not be considered as an approval.

1. It is admitted that: Grades and classifications of potatoes had been established by rules and regulations of the director prior to March 14, 1946, and were then in full force and effect; plaintiff was not the grower or producer of the potatoes purchased by defendant, and no certificate of inspection, as provided by section 74,

supra, was issued to plaintiff at or before the time of the sale to defendant, and no such certificate was ever secured by defendant at the time of resale of the potatoes or at the time that the same were removed from the Moore premises. It also is admitted that defendant made a personal inspection of the potatoes sufficient to satisfy himself of their grade and quality, and upon that inspection entered into a contract for the purchase of the same, relying solely upon his inspection and, as he says, the statement of plaintiff that the potatoes were U. S. No. 1 grade and that an inspector, a short while before plaintiff had purchased the potatoes, had stated that the potatoes would grade U. S. No. 1. Defendant admits that the potatoes were purchased for shipment out of the state of Colorado.

In 1931, a comprehensive act relating to the compulsory inspection and grading of certain fruits and vegetables was enacted (Session Laws, Colorado, 1931, p. 368, Article 9, chapter 69, '35 C.S.A.), certain sections of which act applicable here were amended by Session Laws of Colorado 1943, p. 249.

Section 60, Article 9, supra, contains a "Statement of Purpose" which reads: "In order to provide the means whereby producers of fruits and vegetables, and all interested parties, may secure prompt and efficient inspection and classification of grades of fruits and vegetables at reasonable cost, this subdivision is passed. It is hereby recognized that the standardization of the fruit and vegetable industry by the proper classification and grading of fruits and vegetables by prompt and efficient inspection under competent authority is beneficial alike to producer, shipper, carrier, receiver and consumer, *in that it furnishes the producer and the shipper prima facie evidence of quality and condition of products, it guarantees the carrier and the receiver as to the quality and condition of products carried and received by them and assures the ultimate consumer of*

*the quality and condition of products which are pur-
chased."* (Italics ours)

An analysis of said Article 9, so far as the same can in
anywise affect the factual situation and the issues here
involved, discloses: In section 64 thereof the director and
others acting under him are authorized to enter certain
premises *"where fruits and/or vegetables are kept or
stored by any person engaged in the shipping of fruits
and/or vegetables, or to stop and/or inspect at any time
any automobile, truck, trailer or other vehicle transport-
ing or containing any such fruits and/or vegetables."*
(Italics ours)

In section 65, wherein authorization for establishing
regulations and grades is provided, we find the follow-
ing: "Grades, grading rules and regulations, established
in accordance with the provisions of this section, shall
not be modified during the current *shipping season* of
the fruit or vegetable for which they are established."

In section 66, providing for change in regulations and
grades, we find that this may be accomplished by either
growers or *shippers.*

Section 67 authorizes the director "to promulgate such
rules and regulations relative to the *proper marketing*
of containers, * * * the tagging of the vehicle of trans-
portation, and such other rules and regulations as he
deems necessary for the improvement of the quality of
*marketing* of all fruits and/or vegetables * * *." (Italics
ours)

Section 70 provides that fruits or vegetables for which
grades and classifications had been established might
not be sold unless the same conformed to such grades
and classifications.

Section 72 makes it the duty of every person loading
fruits and vegetables to give notice thereof to the di-
rector or his inspector of the time and place of *loading*
such fruits and vegetables.

By section 73 it is made unlawful for any person to
*ship* fruits or vegetables for which grades and classifi-

cations are applicable unless the same have been inspected and a certificate of inspection showing the grade or other classification thereof issued to the *shipper* by the inspector.

Section 74 makes it mandatory for the inspector of fruits or vegetables about to be *shipped* to issue a certificate of inspection and deliver the same to the *shipper*, and further provides that the certificate so issued be accepted in any court of this state as prima facie evidence of the true grade or other classification of the fruits or vegetables at the time of the inspection thereof.

Section 77 requires the issuance of a license before certain designated fruits and vegetables are *shipped* and prohibits the carrier to receive the same for *shipment* until such license has been obtained.

Section 78, amended S. L. '45, p. 342, establishes maximum fees for inspection of *carload and other shipments,* and therein we find, "such fee shall be paid by the person, firm, corporation or other organization making the *shipment* at the time such service is rendered." (Italics ours)

Section 81 makes it "unlawful to prepare, *deliver for shipment, load, ship, transport, offer for sale or sell for shipment a deceptive pack, load, * * *.*" (Italics ours)

Section 83 makes it "unlawful for any shipper * * * to *ship, transport or accept for shipment any fruit or vegetable within the meaning of this subdivision,* when notified by an inspector that such products are found to be delivered for *shipment* in violation of any of the provisions of this subdivision, * * *." (Italics ours)

Sections 85, 86, 87, 88, 89, 90, 91, 93, 94, 95, 96, 97, amended S. L. '43, p. 249, 98, 99 and 100, all have to do with different fruits and vegetables, and in each it is provided, after a designation of the fruit or vegetable specifically named, that "when being packed or after packing, or *when delivered for shipment, loaded, shipped or being transported, offered for sale or sold for shipment, * * * shall conform to the grades as established*

by the United States department of agriculture and the Colorado director of markets, * * *," (Italics ours) and in all of these sections, except in sections 91 and amended section 97, we find the following, "provided, that it shall be unlawful to *ship* * * * [the fruits or vegetables therein specified] which does not conform to the following minimum standards: * * *" (Italics ours)

Section 101 of Article 9, supra, provides, so far as applicable here, that any person who violates any of the provisions of Article 9, supra, shall be deemed guilty of a misdemeanor and punished as therein provided.

It is noteworthy that the legislature, in enacting section 70, did not specifically provide that one violating its provisions should by so doing be guilty of an unlawful act, whereas in numerous instances referred to above it took the precaution of so doing, and then under the provisions of section 101 of said article inserted a general clause which provided that a violation of "any provision of this subdivision or wilfully interferes with the director * * * in the performance or on account of the execution of his or their duties as provided by this subdivision shall be deemed guilty of a misdemeanor."

██ ██ We fully appreciate that in the interpretation and construction of all statutory law the legislative will and intent is an all-important and controlling factor for it is the prerogative of the legislative branch of the government to declare what the law shall be, and it likewise is the prerogative of the judiciary to finally determine the legislative intent in the enactment of the law, and, therefore, what the law is.

██ From an analysis of Article 9, it seems clear to us that the object and purpose of its enactment, with its amendments, was to prevent the shipment of the fruits and vegetables therein specified unless the same were in a wholesome and fit condition for human consumption, and also to protect, by inspection, the shipper of fruits and vegetables while the same were in transit, in which case the certificate of inspection was prima facie evi-

dence of their condition at the time they were delivered to the carrier. It also is to be noted that there is no provision in the entire act authorizing the inspection of fruits or vegetables except as the same are being loaded or about to be shipped or when they are in "any storehouse, warehouse, cold storage plant, packing house, or any other building or place where fruits and/or vegetables are kept or stored by any person engaged in the shipping of fruits and/or vegetables, or to stop and/or inspect at any time any automobile, truck, trailer or other vehicle transporting or containing any such fruits and/or vegetables." Section 64, supra. We fully appreciate that under the provisions of Article 9 no fruits or vegetables, with exceptions not necessary to note here, specified in the title can lawfully be shipped or reach the ultimate consumer by any means of transportation until they have first been inspected. In the present case it would have been unlawful for the plaintiff to have shipped his potatoes without an inspection and a certificate evidencing the grade thereof, and likewise it would be unlawful, under the provisions of Article 9, for defendant to have shipped the potatoes which he purchased without having the same first inspected and certified as to grade.

In this case, where plaintiff, a licensed dealer, sold potatoes to another licensed dealer without having the same inspected, and after defendant, experienced in the potato business, had made his own inspection, and, relying thereon, had entered into his contract of purchase, it is our considered judgment that the transaction is not within the purview of Title 9.

██ ██ If it had·been the intention of the legislature to make the violation of section 70, supra, a misdemeanor, it would have been a simple mater for it to have so provided. *Forney v. Jones*, 76 Colo. 319, 231 Pac. 158. The contract with which we are here concerned was not void but enforcible. *Little v. Brayton Motor & Accessory Co.*, 70 Colo. 286, 201 Pac. 34; *Forney v. Jones*,

*supra; Williams v. Stringfield,* 76 Colo. 343, 231 Pac. 658; *Wilson v. Mosko,* 110 Colo. 127, 130 P. (2d) 927.

Our disposition of this question makes it unnecessary to determine the other question presented.

The judgment is affirmed.