IRVING SNYDER, DOING BUSINESS UNDER THE FIRM AND STYLE OF DENVER CAR & TRUCK MARKET, APPELLANT, V. HARRY LINCOLN, DOING BUSINESS UNDER THE FIRM AND STYLE OF LIBERTY CAR COMPANY, ET AL., APPELLEES.

45 N. W. 2d 749

Filed January 19, 1951.   No. 32887.

*Levin & Brodkey,* for appellant.

*Wear & Boland,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.
This is an action of replevin prosecuted by appellant

to recover possession of an automobile from appellees. This is a second appeal. The result of the first was a reversal of the judgment and a remand to the district court. Snyder v. Lincoln, 150 Neb. 580, 35 N. W. 2d 483. There was another trial in that court. Harry Lincoln was dismissed from the case at the close of the testimony of the appellant. There is no cross-appeal, and the judgment in his favor is final. A verdict and judgment were rendered for Chauncey Eugene Wilson, and a new trial was denied appellant. The contending parties are Irving Snyder, appellant, and Chauncey Wilson, appellee.

The record of this case recites and counsel have extensively discussed a tangled and, in many respects, unusual series of transactions and circumstances of more than slight volume and complexity, but the appeal may properly be disposed of by a consideration of a few of them.

Appellant, as Denver Car & Truck Market, operated a used automobile business in Denver, Colorado. He employed his brother, Max Snyder, as a salesman. About 2:30 p. m. on Saturday, August 30, 1947, a nice-appearing, well-dressed young man about 30 years of age, five feet nine inches tall, weight about 175 pounds, with light hair, wearing blue pants and khaki jacket, came to the place of business of appellant, which consisted of an open lot and a small building used for an office. He was a total stranger, met and talked with Max Snyder, said he wanted to buy an automobile, and that his name was R. B. or R. Bryan Owen. Snyder showed him around the lot and let him take and drive a car for a demonstration. He returned in a short time and said he did not like the car. Snyder showed him another. He took it for a demonstration, returned shortly, said he liked it, and desired to show it to his wife who was in the city at a location considerably removed from the place of negotiation. Snyder hesitated about granting his request "knowing it is far out." They went in

the office. Snyder told Owen the price of the car was $2,499.00. He knew what his brother had paid for it and the price that had been put on it. Owen wanted to give a check for the car, said he would leave a check, and if his wife liked it they would take it, but Snyder said he could not accept a check unless it was. certified as the banks were closed. Owen wrote a check for $2,499.00, payable to Denver Car & Truck Market, drawn on a Colorado bank, and gave it to Snyder. Snyder then let Owen drive the car away. It had dealer's license plates on it. It was then about 3 p. m. There was a telephone in the office but Snyder made no investigation. The car was not returned.

Snyder testified at the first trial that Owen came on the lot, looked over about three or four cars, gave special attention to a 1946 Chevrolet Aerosedan, the one involved in this suit, asked if he could take it for a trial, Snyder consented, and Owen drove it away and returned in 10 or 15 minutes. They went in the office; Snyder told him the price was $2,499.00; he said he would pay that for the car; he wrote a check on a Denver bank for that amount to the Denver Car & Truck Market as payee, gave it to and left it with Snyder, who told Owen he could take the car; and when Snyder hesitated to consent to the request of Owen to take the car and show it to his wife that was when Owen said that he would leave a check for the car with Snyder.

Snyder did not testify at the first trial as to any act or conversation of Owen concerning any automobile except the one which is involved in this litigation, described as a 1946 Chevrolet Aerosedan, motor number DAM-31926. He testified at the second trial that Owen drove two cars—the first a 1946 Chevrolet Tudor, motor number EDA-17675, to which a dealer pink slip (later described) was attached, and the other the car in suit, motor number DAM-31926.

The pink slip was a form on pink paper devised by the Motor Vehicle Division of the Department of Rev-

enue of Colorado available to dealers in automobiles to be completed and used to entitle a purchaser of a motor vehicle to operate it, but "GOOD ONLY TO REACH THE NEAREST OPEN ISSUING OFFICE where License or Regular Permit can be obtained." It was in two parts divided by a perforation. The upper or smaller had blank spaces properly designated to show, when properly filled in before being used, the engine number, year, make, model, type, name of purchaser, name of seller, date of sale of the vehicle, and for the signature and place of residence of the purchaser of the car. The bottom or larger part was prepared so that it could be pasted on the outside of the rear window of the car involved. It was required that the date of sale be stamped thereon "in numerals not less than ¾ inches in HEIGHT" and there was printed thereon the statement addressed to the dealer: "This Sticker is to be used only on cars sold by you and only at the time of such sale." Printed on each part thereof was an identical number. The sticker important in this case was numbered 55816.

While they were in the office Snyder secured a pink slip, had Owen sign it, and they then went on the lot and Snyder fastened the larger part thereof on a 1946 Chevrolet car. Snyder said the motor number of the car was EDA-17675. A photostatic copy of the stub or smaller part of the slip was produced and is in evidence. There are significant facts about this. The date inserted below the designation thereon "Date of Sale" is "Sept 2." There is testimony that Snyder reported the fact that Owen had not returned the car to the auto theft division of the police department in Denver, and at that time stated, as recorded in the report, that the missing car had no license number but "May Have Pink Deal. Permit #55816." The words "Pink Deal." were explained by the person who took and recorded the report as meaning "pink dealer." The car with motor number EDA-17675 was a 1946 Chevrolet, and the car Owen

took and did not return was a 1946 Chevrolet, but its motor number was DAM-31926. Snyder only says that he had Owen sign the dealer's slip when he was there. He does not say when the stub, the part retained by the dealer, was completed. The date, September 2, given as the date of sale, and other circumstances and permissible inferences may suggest that this was done on September 2, 1947. That was the day Snyder made the report to the police station and the F.B.I.—the third day after the transaction with Owen.

There is evidence that Snyder in his report to the police on September 2 stated that the car was "Locked. No keys in ignition." On November 2, 1947, Snyder made a statement to an insurance company, against whom appellant had made claim for the loss of the car on the basis it had been stolen, in which Max Snyder gave this version of the experience with Owen: "This car was stolen from used car lot at 4400 W. Colfax, Denver, by a man who wanted to buy the car. He wanted to give a check for the car but I told him no to come back Tuesday Sept. 2, and he could have the car. While I was on the other end of the lot, This man drove off in this Chev. On Sept. 2, I notified the police as the car had not been returned." He said he also notified the F.B.I. on that date.

He testified he reported to Lawrence F. Cook, who had charge of the auto theft division of the police department, at his home during the dinner hour, about 7 p. m. on August 30, 1947, the facts about Owen taking and not returning the car. Cook testified that the information Snyder gave him was: " '* * * that the car was missing and a check was left there for a car by R. B. Owen * * *' " and that there were no license plates on the car. When Cook reported to the Automobile Protective and Information Bureau he said, as shown by evidence offered by appellant, that the Denver Car & Truck Market sold the car to Owen who gave his

personal check for it, " '* * * which was found to be rubber.' "

The Denver police station was open and police officers were always on duty. George William Athens, one of them, testified he received the information which he placed in the police report, Exhibit 23, by telephone from Max Snyder at 10:58 a. m. on September 2, 1947, and he correctly stamped the blank on which the report was made at that time to record and verify this fact. The items he did not write thereon are: "figures on the lower left-hand corner"; "penciled writing of the name Snyder"; "R. Bryan Owen"; "See Pick Up H-229"; "Transmitter Date 10-9-47 By Huber"; and "J-17." He said that "9P, 8-30-47" and "10A, 9-2-47" on the line following the words "Date Taken" in the report mean that when Snyder was asked when was the last time he had knowledge of the possession of the car he said it was 9 p. m. on the 30th (August 30, 1947), but that they did not miss it until 10 a. m. on the 2d (September 2, 1947).

The banks of Denver open for business at 10 a. m. The check given by Owen for the full amount fixed as the selling price of the car was known to and in the actual possession of appellant on September 1. He knew the car had not been returned on September 2. He presented the check to the bank on September 2 and asked it to cash the check, and was then told there was no such account in the bank.

Owen transported the car in controversy to Kansas City, Missouri, and offered to sell it to D. B. Pearson Motors, trade name of D. B. Pearson, a used car dealer. Owen represented that he had purchased it from Kellen Motor Company, 811 Broadway, Columbus, Georgia, and exhibited a bill of sale purporting to show a transfer of the car to him. Pearson bought the car for $1,850.00 and paid Owen that amount. There is evidence that he executed a bill of sale and other documents concerning the title and the transfer thereof and delivered them to

Pearson. He secured a certificate of title of the car as permitted and required by the law of Missouri. He sold the car to Hàrry Lincoln, a used car dealer of Omaha, Nebraska, who conducted his business in the name of Liberty Car Company, for $2,125.00, and assigned and transferred to Lincoln the Missouri certificate of title. He had before this transaction bought many cars from Pearson. Lincoln surrendered the Missouri certificate of title and secured a Nebraska certificate of title in accordance with the law of this state. He had the car from September 5, 1947, until October 14, 1947. On the last date he sold it to Chauncey Eugene Wilson for $2,200.00, and transferred and delivered the Nebraska certificate of title and the car to him, and it was from him that the car was taken by replevin.

Lincoln had known Wilson a long time and had done business with him for about four years. He sold him a 1947 half-ton Chevrolet truck and a 1947 Ford sedan earlier on the same day that he sold him the car involved in this case. Appellee negotiated for the purchase of the automobile from Harry Lincoln in the usual course of business, bought it, paid the full purchase price, received lawful evidence of title, as provided by the law of Nebraska, and actual and uncontested possession of the car. After he had bought the Chevrolet truck and the Ford sedan at the place of business of Harry Lincoln, appellee inquired if he had any Chevrolet Aerosedans. The reason he gave for doing this was that they were a type of car that was "a good seller and easy to handle." He had been selling motor vehicles for more than 30 years in and around Gothenburg, Nebraska. Lincoln informed Wilson he had one that his brother Norman had driven to his home the night before, that it was there, and he offered to take appellee and show him the car. This was done. Appellee examined and bought it. The reason the car was not at the place of business was satisfactorily explained. There is no dispute about it. Norman Lincoln was employed by his

brother Harry. The hours of his employment were from noon until 9:30 or 10 p. m. It was understood between them that Norman might drive this car home when he finished work at night. Norman Lincoln had not come to work yet that day and hence the car was at his home in his garage.

The district court was authorized and required to take judicial notice of the laws of Colorado. § 25-12,101, R. R. S. 1943. A purchaser of an automobile in that state may acquire title without complying with the law thereof on the subject of the transfer of title of motor vehicles. Noncompliance may subject the buyer to a penalty, but his title to the vehicle, the subject of the sale, is not affected by his omission or violation. In Wilson v. Mosko, 110 Colo. 127, 130 P. 2d 927, the court of that state said: "If one owning a car sells and delivers it to another without assigning and delivering the certificate of ownership therefor, and the purchaser receives it under those conditions, the sale is unlawful * * * though not void, notwithstanding both seller and buyer are guilty of a misdemeanor under the statute." See, also, Forney v. Jones, 76 Colo. 319, 231 P. 158; Cole v. Lindsey, 120 Colo. 501, 211 P. 2d 544.

The manner of testing the sufficiency of evidence to support a verdict in a law action has recently been stated: "In determining the sufficiency of evidence to sustain a verdict it must be considered most favorably to the successful party, any controverted fact resolved in his favor, and he must have the benefit of inferences reasonably deducible from it." Bolio v. Scholting, 152 Neb. 588, 41 N. W. 2d 913.

The challenge of appellant to the sufficiency of the evidence to justify and require the submission of this case to the jury to determine whether he had made a sale of the automobile to Owen, or whether he had come into possession of it as appellant claims by larceny, cannot be sustained.

If Owen obtained the car from appellant by a sale

induced by fraud, and as a result thereof title passed to Owen, and thereafter appellee was an innocent purchaser of and acquired the title thereto, he took it free from any right of appellant to rescind the sale and reclaim the automobile. When personal property is obtained from its owner by a sale induced by the fraud of the buyer by virtue of which title passes to the party guilty of the fraud, an innocent purchaser of the property from the fraudulent buyer or from one to whom he has surrendered it, for value and without knowledge of the fraud, takes the title thereto free from the equity of the original·seller to rescind the sale and reclaim the property. In other words, if after the seller delivers possession to the buyer pursuant to a sale induced by the buyer's fraud the property has passed into the hands of a bona fide purchaser for value, the right of the original seller to recover the property is lost. Snyder v. Lincoln, *supra;* Uniform Sales Act, § 69-424, R. R. S. 1943; 46 Am. Jur., Sales, § 471, p. 635.

The status of a bona fide purchaser from a fraudulent buyer is determined by the rules applicable in any other situation where one asserts the right to protection as an innocent purchaser. Uniform Sales Act, § 69-424, R. R. S. 1943; 46 Am. Jur., Sales, § 464, p. 629. An innocent purchaser is one who buys property for a present valuable consideration without knowledge sufficient to charge him in law with notice of any infirmity of the title of the seller. Wallich v. Sandlovich, 111 Neb. 318, 196 N. W. 317; Justice v. Shaw, 103 Neb. 423, 172 N. W. 253; Annotation, 107 A. L. R. 502; 46 Am. Jur., Sales, § 465, p. 630. See, also, Mingus v. Bell, 148 Neb. 735, 29 N. W. 2d 332.

There is no evidence of any fact or circumstances known to appellee or of which he should have taken notice that could have suggested or indicated to him a defect in the title of Harry Lincoln to the automobile at the time he sold it to appellee. Appellee was an innocent purchaser of the automobile and the district court correctly instructed the jury to that effect.

Appellant claims prejudicial error because Exhibit 23 was received in evidence. It was identified in a deposition as Exhibit 1, and is in that manner sometimes referred to in the record. Appellant introduced testimony as to the source of the information stated therein, the means, manner, and purpose of the making thereof, and put a part of the contents of the exhibit in evidence. Parts of it were placed in evidence by the exhibition of the exhibit to and examination of a witness concerning things set forth therein and the meaning thereof. A similar complaint is made because of the admission in evidence of Exhibit 25 (also referred to as Exhibit 3). It is a copy of a letter produced by appellant, identified by a witness while being examined by counsel for appellant, and at his request the first paragraph thereof was read into the record by the witness. The verity of the statements made in the part of the exhibit read was established by the witness, who was the person named therein as the source of the information. The part of the exhibit thus introduced in evidence is the only portion of the writing that could have been prejudicial to appellant. Any effect of the remaining parts were favorable to him. The exhibits were properly received. The code provides that: "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other." § 25-1215, R. R. S. 1943. See, also, Baxter v. National Mtg. Loan Co., 128 Neb. 537, 259 N. W. 630; Roeder v. State, 119 Neb. 116, 227 N. W. 446; 20 Am. Jur., Evidence, § 914, p. 770.

It is claimed that Exhibit 26 was immaterial to any issue in the case and that foundation was lacking for its receipt in evidence. The objections are not valid. It was sufficiently identified and was proper to be considered by the jury in determining whether the vehicle in question was or was not sold by appellant.

The claim of error resulting from the action of the district court sustaining objections to questions asked

the witness Alan G. Hoskins is not sustained by the record. There was no showing what the answer of the witness would have been to any question propounded to him. The action of the trial court cannot be reviewed on appeal because of the absence of an offer of what appellant expected to show by the testimony of the witness. Blondel v. Bolander, 80 Neb. 531, 114 N. W. 574.

Error is assigned because the offer of Exhibit 4 was allowed by the district court. It was a statement signed by the witness Max Snyder purporting to relate the facts of what transpired at the time the vehicle was taken from the place of business of appellant. It contains statements in conflict with the testimony of the witness given on each of the trials of this case. It was clearly shown that appellant had no insurance coverage on the automobile, the subject of this action, and that he had not received any indemnity because of its loss. The assignment is without merit.

Appellant argues that the admission of Exhibit 13 was error. This was a transcript of the record of a case in the district court of Denver County, Colorado, brought by appellant against an insurance company on a claim that the car involved in this case had been stolen from him. Statements made therein by appellant tended to impeach testimony given by him on the trial of this case. Counsel for appellant did not object to, but approved its admission as evidence. The failure of a litigant to object to the introduction of evidence when it is offered precludes him from thereafter complaining that its reception was error. Ryne v. Liebers Farm Equipment Co., 107 Neb. 454, 186 N. W. 358; In re Estate of House, 145 Neb. 866, 18 N. W. 2d 500, 159 A. L. R. 401.

The charge of the district court advised the jury that one who secures possession of property by larceny cannot convey good title even to an innocent purchaser, but that when property is sold and delivered to a fraudulent vendee an innocent purchaser of the property from

the fraudulent vendee acquires good title. Larceny was not defined. Neither was the jury given any criterion by which it could distinguish larceny from a sale induced by fraud. Appellant requested that the jury be informed: (a) That where an owner of personal property is induced by fraud to part with its possession, without intending also to part with title to the property, the transaction is larceny if the person so receiving possession without title has, at the time, a secret intention of converting it permanently to his own use and does so without consent of the owner; (b) that while it is generally true that in larceny the taking must be a trespass against the owner's possession, yet, where fraud is practiced to obtain possession, no actual violence is necessary because the fraud takes the place of violence; (c) that mere possssion of personal property, by whatever means acquired, in the absence of ownership or authority from the owner to sell, will not, in the absence of estoppel, enable the person in possession to give good title as against the true owner, even to a purchaser in good faith; and (d) that if an individual obtains possession of an automobile by fraudulent representations, and is guilty of larceny by trick because of his secret intention to convert the automobile permanently to his own use, without consent of the owner, he receives mere possession of the automobile without title, ownership, or authority to sell it and transfer title to another.

The instructions given contain the words "sale," "sell," and "sold," but do not state what constitutes a sale of property. Appellant requested an instruction to the effect that the essential thing in the passing of title to personal property is that the seller and the buyer intend that the title thereto shall pass from the former to the latter, and not what induced them to have that intention. The tendered instruction was refused.

Appellant requested the court to instruct the jury that the general rule is that where one of two innocent persons must suffer by the acts of a third, he whose con-

duct, act, or omission enables the third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts and altered his position to his detriment. The foregoing rule does not apply in cases where the wrong was accomplished through the instrumentality of a criminal act since the crime and not the negligent act is the proximate cause of the injury. This request was refused but an instruction given by the court did contain the substance of the first sentence of the tendered instruction but wholly omitted the last sentence thereof.

The refusal of the court to give the tendered instructions referred to in the foregoing and the omission of the court to instruct in regard to the matters specifically noted above was error prejudicial to appellant. If the statements of the charge to the jury upon material matters are general, an explanatory instruction which is pertinent and applicable to the situation should be given if requested. It is error to refuse an instruction warranted by the law and the evidence not covered by other instructions given. First National Bank v. Carson, 30 Neb. 104, 46 N. W. 276; Crosby v. Ritchey, 56 Neb. 336, 76 N. W. 895. It is error to refuse a proffered instruction warranted by the evidence and correctly stating the law applicable to the case unless the matter involved is covered by other instructions. A litigant is entitled to have his theory supported by competent evidence submitted to the jury. Dunlap v. Welch, 152 Neb. 459, 41 N. W. 2d 384; McKain v. Platte Valley Public Power & Irrigation Dist., 151 Neb. 497, 37 N. W. 2d 923.

The judgment should be and it is reversed, and the case is remanded to the district court.

REVERSED AND REMANDED.